**NOT FOR PUBLICATION WITHOUT THE
APPROVAL OF THE APPELLATE DIVISION**

This opinion shall not "constitute precedent or be binding upon any court." Although it is posted on the internet, this opinion is binding only on the parties in the case and its use in other cases is limited. R. 1:36-3.

SUPERIOR COURT OF NEW JERSEY
APPELLATE DIVISION
DOCKET NO. A-4235-16T2

PMG NEW JERSEY II, LLC,

    Plaintiff-Appellant,

v.

133 COLONIA, LLC, and ZONING
BOARD OF ADJUSTMENT OF THE
TOWNSHIP OF WOODBRIDGE,

    Defendants-Respondents.

_____

Argued December 20, 2018 – Decided July 22, 2019

Before Judges Simonelli, Whipple and DeAlmeida.

On appeal from the Superior Court of New Jersey, Law Division, Middlesex County, Docket No. L-3903-16.

Bernard M. Riley argued the cause for appellant (Gasiorowski & Holobinko, attorneys; Ronald S. Gasiorowski, on the briefs).

Timothy M. Casey argued the cause for respondent Zoning Board of Adjustment of the Township of Woodbridge (Russo & Casey, attorneys; Timothy M. Casey, of counsel and on the brief).

James M. Turteltaub argued the cause for respondent 133 Colonia, LLC (Carlin & Ward, PC, attorneys; James M. Turteltaub, of counsel and on the brief).

PER CURIAM

In this prerogative writs matter, plaintiff PMG New Jersey II, LLC (PMG) appeals from the May 1, 2017 Law Division judgment dismissing its complaint and affirming the resolution of the Zoning Board of Adjustment (Board) of the Township of Woodbridge (Township) granting defendant 133 Colonia LLC (Colonia) preliminary and final site plan and use and bulk variance approval to redevelop its property. For the following reasons, we affirm.

I.

Colonia's property is physically located near mile-marker 133 northbound on the Garden State Parkway (GSP) and is accessible only from the GSP. The property is unique property, as it was located in the R-40 low-density residential zone, but is surrounded entirely by property owned and controlled by the New Jersey Turnpike Authority (Authority) with an emergency access road from the property to local roads that is blocked by a locked gate. The site contains a Shell gasoline station canopy, eight gasoline-refueling pumps, convenience store and an unutilized repair garage. The site has been a service area for the traveling public on the GSP since 1954, and thus predates the adoption of the Township's

Land Use and Development Ordinance and is a valid pre-existing nonconforming use.

PMG owns adjoining property at the service area that is nearly identical in size to Colonia's property and is also located in the R-40 zone. PMG's property contains an Exxon gas station with six multi-product dispensers, a 2748 square foot building containing a convenience store, a Subway fast food restaurant and thirteen parking spaces.

In 2014, Colonia filed an application with the Board for preliminary and final site plan approval to demolish the improvements and redevelop the site with a 2450 square foot building containing a 1225 square foot mini-mart/convenience store and a 1225 square foot Dunkin' Donuts restaurant with a drive-through lane and window. Colonia also sought to increase the size of the gasoline station canopy, increase the number of gas refueling pumps to thirteen, and add an employee kiosk to the gasoline refueling area. Fourteen parking spaces would be created, leading to thirty-six holding areas for vehicles when considering the capacity for nine cars in the drive through and thirteen cars at the gasoline refueling pumps. In addition, Colonia proposed to pay for the Authority to construct a twenty-foot wall between the site and neighboring residences to reduce the impact on those residences.

Colonia also proposed to remove the existing gasoline storage tanks and replace them with modern, double-walled fiberglass tanks. As part of the tank replacement, Colonia would perform any necessary soil remediation and replace the existing metal fill caps with fiberglass caps to reduce the sound the public claimed was emitted when the tanks were being filled.

Because the convenience store, Dunkin' Donuts and gasoline station were non-permitted uses in the R-40 zone, Colonia applied for three use variances under N.J.S.A. 40:55D-70(d)(1).[1] Colonia applied for a use variance under N.J.S.A. 40:55D-70(d)(2),[2] as the sale of fuel was a non-permitted use it sought to expand. Colonia also applied for several bulk variances under N.J.S.A. 40:55D-70(c) regarding setbacks, landscaping area, prohibitions against signs, and lot size.

---

[1] N.J.S.A. 40:55D-70(d)(1) provides that "for special reasons, [a board of adjustment shall have the power to] grant a variance to allow departure from regulations pursuant to [N.J.S.A. 40:55D-62 to -68.6] to permit . . . a use or principal structure in a district restricted against such use or principal structure[.]"

[2] N.J.S.A. 40:55D-70(d)(2) provides that "for special reasons, [a board of adjustment shall have the power to] grant a variance to allow departure from regulations pursuant to [N.J.S.A. 40:55D-62 to -68.6] to permit . . . an expansion of a nonconforming use[.]"

The Board held public hearings on May 7, 2015, June 18, 2015, September 24, 2015, October 8, 2015, and December 3, 2015. On May 7, 2015, Colonia's expert licensed engineer, John Palus, testified to the details of the application, and its expert professional traffic engineer, Nicholas Verderese, testified to the traffic conditions and the impact of the proposed plan. The Board then heard questions and comments from the public about the close proximity of the site to residences and a high school, issues with parking and fencing surrounding the site, and increases in noise and light.

On June 18, 2015, Palus testified in response to the questions and comments. John McDonough, a professional planner, also testified in support of the requested "d" and "c" variances and addressed how the plan satisfied the criteria under the Municipal Land Use Law (MLUL), N.J.S.A. 40:55D-1 to -163. The Board then heard questions and comments from the public.

On September 24, 2015, Palus, McDonough and Verderese responded to the questions and comments and testified as to changes made to the plan. That same day, PMG's expert professional planner, Andrew Thomas, and expert traffic engineer, Lee Klein, testified in opposition to the application. The Board then heard questions and comments from the public.

On October 8, 2015, Thomas continued his testimony, specifically as to why the plan did not satisfy the criteria under the MLUL, and was cross-examined. The Board then heard questions and comments from the public.

At the hearing on December 3, 2015, the Authority's attorney presented the Authority's objection to the proposed twenty-foot wall. The Board adjourned further testimony to afford Colonia the opportunity to revise the plan in response to the Authority's objection.

At the final hearing on February 4, 2016, McDonough and Thomas testified to the revisions made to the plan in response to the Authority's objection. Colonia reduced the size of the fencing to eight feet to run behind the site and up to the neighboring residences, and proposed to erect an eight-foot fence, along with a landscaping buffer, between the residences and the site to ameliorate the impacts the use will have on the adjoining neighborhood. The landscaping buffer would be in the form of planted trees, around fourteen feet high, to help soften the look of the fence and the sound from the property. Because the maximum height for front and side yard fences in the R-40 zone was four and six feet, respectively, the fences required height variances. The Board then heard questions and comments from the public.

At the conclusion of the hearing, the Board granted Colonia's application with conditions, including that the Authority approve the plan, which it did. On May 19, 2016, the Board adopted a comprehensive resolution, identifying each of the variances requested, detailing the evidence presented, and setting forth its findings, analysis, and reasons for approving the application and granting the variances. The Board rejected the testimony of PMG's experts, finding their opinions were net opinions unsupported by any relevant facts. In contrast, the Board found that Colonia's experts were credible witnesses and their testimony supported the Board's findings that:

> (1) approval of the application will not substantially impact the purpose and intent of the Master Plan and Zoning Ordinance;
>
> (2) the property is unique and particularly suited for the proposed use;
>
> (3) the application as proposed and amended will operate in a safe and efficient manner from an engineering point of view, and addressed all of the concerns of the Board's engineering expert;
>
> (4) the existing conditions are outdated and not properly oriented and the replacement of the existing structures will improve the site and its functionality;
>
> (5) the removal and replacement of the existing underground storage tanks will accelerate the remediation of any contamination on the site thereby providing a benefit to the site and the community as a

whole, and Colonia's agreement to retrofit the new tanks with fiberglass lids to attenuate any noise during deliveries of fuel to the site was a benefit to the site and surrounding properties;

(6)     the proposed fencing will in conjunction with the additional landscaping provide a buffer to the adjoining residential properties, which is an improvement over existing conditions on the site;

(7)     the site will function efficiently and safely with the proposed drive-through element from an engineering, planning and traffic engineering perspective;

(8)     the site has been designed to provide for safe and efficient vehicle circulation including fuel trucks making deliveries to the site;

(9)     the proposed parking provides more than adequate parking for the site, any change in traffic generated will be imperceptible, and the site would continue to function at a level acceptable according to industry standards;

(10)    the application advances N.J.S.A. 40:55D-2 in that the site is particularly suited for the proposed use, as it is one of eight service areas on the GSP and has existed at the location for over sixty years serving the motoring public and therefore general welfare with no impact on the surrounding residential uses;

(11)    the site is an appropriate location for the proposed drive-through consistent with N.J.S.A. 40:55D-2(g);

(12)    Colonia established that the application advances N.J.S.A. 40:55D-2(i), as it will replace the existing site

8

with a new more contemporary look for the site, and advances N.J.S.A. 40:55D-2(m), as it is an efficient use of land by redeveloping the site which was preferable to finding a new location;

(13) the promotion of the free flow of traffic on the site and operation in a safer and efficient manner advances N.J.S.A. 40:55D-2(h);

(14) the application advances N.J.S.A. 40:55D-2(c), as it provides adequate light and space with the proposed improvements to the rear setbacks, the improved substantial landscaping and evergreen buffering of the residential uses; and

(15) the application advances the purposes of zoning in N.J.S.A. 40:55D-2(d), as the site is designated as a PA-1 zone where redevelopment is encouraged.

The Board concluded that Colonia established special reasons justifying approval of the application and requested "d" variances, and that the location of the site on the GSP, while in the R-40 zone, is not likely to be developed for a use permitted in that zone.

The Board also concluded it could grant the requested "c" variances, as the benefits outweighed the detriments and Colonia established the relief requested as a flexible "c" as well as a (c)(1) hardship variance due to the depth of the property. The Board also found the application was reconciled with the Master Plan, which emphasizes the importance of a stable viable commercial

base and encouraging development proximate to major highways, and proposing the redevelopment of the site on the GSP was consistent with the Master Plan.

Thereafter, on June 29, 2016, the Township adopted Ordinance 16-38, which rezoned Colonia's and PMG's properties to the B-3 Highway Business Zone. Ordinance 16-38 was codified into the Township's Land Use Ordinance § 150-35. Ordinance § 150-35A states that the B-3 zone is designed "to provide areas for retail sales and services to accommodate the traveling public . . . and to provide highway-oriented commercial uses in the proper location." Under Ordinance § 150-35C(1), "[d]rive-in, drive-through, fast-food and take-out restaurants[,]"and "[r]etail stores, large format" are permitted principal uses in the B-3 zone. Ordinance § 150C(2) permits several conditional uses, including "[a]utomotive . . . service" and "[a]ll conditional uses permitted in the B-1 [Neighboring Business] Zone." "Automotive gasoline stations" are conditional uses permitted in the B-1 zone. Ordinance § 150-35 also has bulk requirements for the B-3 zone, including minimum lot sizes, setbacks, coverages, and building heights.

On July 11, 2016, PMG filed a complaint in lieu of prerogative writs, challenging the Board's decision. At a hearing before the trial court, PMG argued, in part, that the Board's approval of the "d" variances for the non-

permitted commercial uses in the R-40 zone was arbitrary and invalid because Colonia's proofs failed to demonstrate a proper basis for the "d" variances with numerous "c" variances. PMG argued that Colonia's failure to include the Authority's emergency access road in its public notice to property owners within 200 feet of the Authority's property was a fatal jurisdictional defect warranting reversal of the Board's approval of Colonia's application. PMG further argued the Board's resolution failed to detail and support the positive and negative criteria for the "d" variances, as required by Medici v. BPR Co., 107 N.J. 1, 14-15 (1987).

In a May 1, 2017 written decision, the trial judge affirmed the Board's resolution and dismissed PMG's complaint with prejudice. The court concluded the Board's findings were well-supported by the record and the decision conformed with the provisions of the MLUL, specifically N.J.S.A. 40:55D-70(d).

The court also found it was appropriate to consider the time of decision rule,[3] as the Township had amended its zoning ordinance to change the zoning

---

[3] Under the time of decision rule, "a decision concerning a land use application would be based on the municipal ordinance as it existed at the time the application or appeal was being decided." Jai Sai Ram, LLC v. Planning/Zoning Bd., 446 N.J. Super. 338, 343 (App. Div. 2016).

district in which the site was located from R-40 to B-3, and the B-3 zone permitted gasoline stations and retail stores and fast food restaurants. The court stated that remanding the application back to the Board and requiring Colonia to reapply would result in the "same conclusions rendered by the Board here."

The court rejected PMG's assertion that Colonia's public notice was deficient, finding the "Authority may not have received notice as a property owner within 200 feet of the [p]roperty, but it did have actual notice of the application evidenced by the appearance of its attorney to confirm its agreement to the proposal." The court further found that Colonia relied on the list provided by the Township with respect to the notices, and the Authority did not fall under the independent notice requirement of N.J.S.A. 40:55D-12(f).

Lastly, the court determined that PMG had waived its arguments regarding the validity of the "c" variances by not addressing them. Nevertheless, the court addressed the merits and found that "such bulk regulations are generally subsumed in the grant of a (d)(1) variance. The bulk regulations applicable to a development in the [R-40] residential zone have no relationship to the development of a commercial enterprise." This appeal followed.

II.

A.

PMG reiterates that the Board's decision to approve the "d" variances with numerous "c" variances was arbitrary, capricious and unreasonable because Colonia's proofs failed to demonstrate a proper basis for the "d" variances for the four non-permitted uses on the site. We disagree.

"[T]he role of a judge in reviewing a local variance determination is solely to ascertain whether the action of the board is arbitrary." Kenwood Assocs. v. Bd. of Adjustment, 141 N.J. Super. 1, 4 (App. Div. 1976). "[The judge] cannot substitute his [or her] own judgment for that of the municipal board invested with the power and duty to pass upon the application." Ibid.; see also Advance at Branchburg II, LLC v. Twp. of Branchburg Bd. of Adjustment, 433 N.J. Super. 247, 253 (App. Div. 2013). "The board of adjustment weighs the facts and the zoning considerations, pro and con, and will be sustained if its decision comports with the statutory criteria and is founded in adequate evidence." Mahler v. Bd. of Adjustment, 94 N.J. Super. 173, 185-86 (App. Div. 1967). We apply the same standard of review as the trial court. Grubbs v. Slothower, 389 N.J. Super. 377, 382-83 (App. Div. 2007).

"The action of the board is presumed to be valid." Kenwood, 141 N.J. Super. at 4. "[L]ocal officials 'who are thoroughly familiar with their community's characteristics and interests and are the proper representatives of its people are undoubtedly the best equipped to pass initially on such applications for variance.'" Medici, 107 N.J. at 14-15 (quoting Kramer v. Bd. of Adjustment, Sea Girt, 45 N.J. 268, 296 (1965)). Only a showing by the plaintiff of "clear and compelling evidence" may overcome this presumption. Spring Lake Hotel & Guest House Assoc. v. Borough of Spring Lake, 199 N.J. Super. 201, 210 (App. Div. 1985); see also Dome Realty, Inc. v. City of Paterson, 83 N.J. 212, 235 (1980) ("courts place a heavy burden on the proponents of invalidity"). Applying the above standards, we discern no reason to reverse.

Under the MLUL, a zoning board of adjustment has the power to grant a variance to permit, among other things, "(1) a use or principal structure in a district restricted against such use or principal structure, [and] (2) an expansion of a nonconforming use[.]" N.J.S.A. 40:55D-70(d). To justify a "d" variance, an applicant must fit within at least one of the three "special reasons" categories set forth in N.J.S.A. 40:55D-70(d):

> (1) where the proposed use inherently serves the public
> good, such as a school, hospital or public housing

facility; (2) where the property owner would suffer undue hardship if compelled to use the property in conformity with the permitted uses in the zone; and (3) where the use would serve the general welfare because the proposed site is particularly suitable for the proposed use.

[Dunbar Homes, Inc. v. Zoning Bd. of Adjustment, 233 N.J. 546, 553 n.3 (2018) (quoting Nuckel v. Borough of Little Ferry Planning Bd., 208 N.J. 95, 102 (2011)).]

These "special reasons" are often referred to as the "positive criteria." Sica v. Bd. of Adjustment, 127 N.J. 152, 156 (1992).

"'Undue hardship' in the form of 'economic inutility' has also been acknowledged to constitute a special reason to support a use variance." Anfuso v. Seeley, 243 N.J. Super. 349, 371 (App. Div. 1990) (quoting Medici, 107 N.J. at 17 n.9). What constitutes "economic inutility" sufficient to grant a use variance has been described as: "whether the . . . restriction, viewing the property in the setting of its environment, is so unreasonable as to constitute an arbitrary and capricious interference with the basic right of private property." Ibid. (quoting Brandon v. Bd. of Comm'rs, 124 N.J.L. 135, 150 (Sup. Ct. 1940)).

In addition, "'[u]nique suitability' is a well-established category of special reasons." Id. at 372 (quoting Ward v. Scott, 16 N.J. 16, 22 (1954)). The court in Medici noted that, "unique" is synonymous with "particular"; thus proof is

15

only required of "'particular' suitability to sustain a finding of special reasons." 107 N.J. at 9 n.4.

The Board found there were special reasons sufficient to grant the "d" variances, specifically: (1) the site was particularly suited for the proposed use; (2) the public would benefit from the environmental remediation attendant with the updating of the underground fuel storage tanks; (3) the use of the land would be efficient because it would be replacing the existing fuel station with an updated one rather than building on a completely new site; (4) the improved landscaping would provide a buffer to the surrounding residences that was not previously there; and (5) the site is not likely to be developed for a use permitted in an R-40 zone.

The record amply supports these findings. For example, McDonough, who testified to the positive criteria, said that "the only real permitted use here is an estate home, which I think we can all agree from a practical reality standpoint would never happen at this particular location." He also testified that even if a home was going to be built on the lot, the "site is undersized in terms of the zoning requirements for the zone . . . 18,000 square feet, whereas 40,000 square feet is what is required under the [zone]. Essentially you would get a house half the size of the estates that are there."

The Board explicitly found the property was unique and, based on the testimony of Palus and McDonough, found it to be particularly suited for the proposed use. This finding is supported by sufficient evidence in the record. Palus testified that the only public access to the property leads to and from the GSP. McDonough testified that "the promotion of the general welfare is served because the site is particularly suitable for the use by virtue of its context, again being one of only eight service areas along the [GSP]. The property's fundamental purpose is to serve travelers and the motoring public." McDonough also testified:

> the site is particularly suitable by virtue of its condition. The property has been serving the motoring public for [sixty] years. Its connection is completely related to the [GSP] and not to the residential uses that are behind it, both from a physical connectivity standpoint and a visual standpoint as well. It is oriented towards the Parkway and connected to the Parkway.

As such, the record amply supported the Board's finding that Colonia satisfied the positive criteria for the "d" variances.

However, before granting a "d" variance, there must be "a showing that such variance or other relief can be granted without substantial detriment to the public good and will not substantially impair the intent and the purpose of the zone plan and zoning ordinance." N.J.S.A. 40:55D-70. These two requirements

17

are referred to as the "negative criteria." Sica, 127 N.J. at 159. Where the proposed use "is not one that inherently serves the public good," Medici, 107 N.J. at 4, the applicant is required to prove, and the Board required to find, that the negative criteria have been satisfied by "an enhanced quality of proof." Price v. Himeji, LLC, 214 N.J. 263, 286 (2013) (quoting Medici, 107 N.J. at 4).

To satisfy the first negative criteria, the Board "must evaluate the impact of the proposed use variance upon the adjacent properties and determine whether or not it will cause such damage to the character of the neighborhood as to constitute 'substantial detriment to the public good.'" Medici, 107 N.J. at 22 n.12 (quoting Yahnel v. Bd. of Adjustment, 79 N.J. Super. 509, 519 (App. Div. 1963)). For commercial uses, "any benefit to the general welfare derives not from the use itself but from the development of a site in the community that is particularly appropriate for that very enterprise." Id. at 18.

As previously stated, the Board found the site is particularly suited for the proposed use, and thus this supports a finding under the first of the negative criteria. In addition, the testimony supports a finding that the proposed use will not cause damage to the character of the neighborhood and will, in fact, improve the neighborhood. The site contained a gasoline station with an unused repair garage. As Colonia represented, a number of the proposed improvements would

"improve the situation, not only from what [the] project is going to cause, but the existing conditions today" and were added to the plan "to try to respond to the comments . . . and the understanding of what some of the concerns of the neighbors were."

For example, the lighting was visible under the present conditions and the proposed plan included planting trees to address the impact of the lights of the gasoline station on the nearby residences. Further, the site had no soundproofing to reduce its impact on the neighborhood and the proposed plan included sound attenuating fencing. The Authority's access road had been a problem for the adjoining residences because it was not always kept locked and would sometimes be used to access the gasoline. Under the plan, the access road will be kept locked and secure. Moreover, the proposed plan included environmental remediation efforts and improvements to storm water drainage. As such, the record clearly established that Colonia satisfied the first of the negative criteria under N.J.S.A. 40:55D-70 based on an enhanced quality of proofs.

"The proof required for the second of the negative criteria must reconcile the grant of the variance for the specific project at the designated site with the municipality's contrary determination about the permitted uses as expressed through its zoning ordinance." Himeji, 214 N.J. at 286. The nature of these

proofs depends on the specific circumstances of the case. <u>Medici</u>, 107 N.J. at 21 n.11.

The Board found that

> based on the testimony of [Colonia's] witnesses, its knowledge of the neighborhood and review of the plan submitted and all of the evidence submitted by all parties that approval of the application will not substantially impact the purpose and intent of the Master Plan and Zoning Ordinance of the Township of Woodbridge.

The Board found that "the purpose of zoning . . . is . . . advance[d] by the application as the site is designated a PA-1 zone [where] redevelopment is encouraged." The Board also found that:

> the approval of the application is reconciled with the master plan which emphasizes the importance of a stable viable commercial base and encouraging commercial development proximate to major highways. The [B]oard finds the application proposing the redevelopment of the site on the [GSP] consistent with the [M]aster [P]lan.

Lastly, the Board found that Colonia established that the plan advanced the purposes set forth in the MLUL, specifically N.J.S.A. 40:55D-2 (c), (d), (g), (h), (i) and (m).

The record amply supports these findings. McDonough testified that, "[t]he [S]tate plan designates this site as a PA-[1] zone, which is the highest

targeted growth zone in the state where redevelopment is encouraged. And our [S]tate law has found that advancement of state policy is in the public interest and a special reason." He also testified:

> the relief can be granted without substantial impairment to the zone plan, certain[ly] the [M]aster [P]lan goal that emphasizes over and over the importance of a stable, viable commercial base is a recurring theme that we see in that 2009 [M]aster [P]lan. Your goals and objectives that are specifically advanced include "to attract retailers," "to expand the tax base," and "to encourage commercial development proximate to major highway corridors."

PMG's witnesses testified in opposition to the application, but only one of these witnesses,[4] Thomas, actually testified in any capacity to the applicability of the positive and negative criteria. For instance, Thomas testified to potential issues with volume of traffic, delivery vehicles, the amount of parking available, and potential issues caused by having a gasoline refueling tanker present at the site while other cars and trucks are present. He also opined that the site was not particularly suitable for the proposed use because having multiple uses on the site would be "a very intense use," and "the number of uses that we are talking

---

[4] Klein testified to his concerns regarding the amount of parking available, the amount of predicted traffic through the site, and the drive-through. He offered no testimony as to whether the proposed plan did or did not satisfy the positive or negative criteria.

about is really typical of a larger service area on the [GSP]." He testified that the alternative was not to overbuild the site.

Thomas also testified he did not believe the proposed plan satisfied the positive criteria under N.J.S.A. 40:55D-70 due to "the size of the site and the number of uses[.]" He also did not believe the plan satisfied the negative criteria because in his "opinion the variances if granted would cause substantial detriment to the intent and purpose of the zoning ordinances, and the variances being requested will cause a substantial detriment to the public good, including the site itself and the surrounding neighborhood."

The Board rejected the testimony of Thomas and Klein, finding they rendered "net opinions unsupported by any relevant facts." PMG has not challenged this determination, and even if it had done so, "it is well settled that the Board 'has the choice of accepting or rejecting the testimony of witnesses. Where reasonably made, such choice is conclusive on appeal.'" Kramer, 45 N.J. at 288 (quoting Reinauer Realty Corp. v. Nucera, 59 N.J. Super. 189, 201 (App. Div. 1960)). Because PMG has not shown the Board's decision to reject its experts' testimony was arbitrary, capricious or unreasonable, the Board's rejection is conclusive on appeal.

The proofs on which the Board judged the negative criteria were squarely in favor of granting the "d" variances. Because Colonia established both the positive and negative criteria required by N.J.S.A. 40:55D-70, we discern no reason to reverse the Board's grant of the "d" variances.

B.

While not explicitly argued, implied in PMG's argument regarding the "d" variances is an argument that the Board should not have granted the requested "c" variances.

Under N.J.S.A. 40:55D-70(c)(1), the Board has the power to grant a bulk variance where

> (a) by reason of exceptional narrowness, shallowness or shape of a specific piece of property, or (b) by reason of exceptional topographic conditions or physical features uniquely affecting a specific piece of property, or (c) by reason of an extraordinary and exceptional situation uniquely affecting a specific piece of property or the structures lawfully existing thereon, the strict application of any regulation . . . would result in peculiar and exceptional practical difficulties to, or exceptional and undue hardship upon, the developer of such property, grant, upon an application or an appeal relating to such property, a variance from such strict application of such regulation so as to relieve such difficulties or hardship[.]

Colonia requested a number of bulk variances regarding issues such as setbacks, landscaping area, prohibitions against signs, and lot size. McDonough testified in support of these "c" variances, stating that:

> in terms of the setbacks, it is impractical or impossible to meet any setback requirement on this property. You have a front yard setback requirement of [seventy-five] feet. You have a rear yard setback requirement of [seventy-five] feet. That adds up to 150 feet. The lot is only 100 feet deep. So, no matter what you do on this property, you need a bulk variance.

McDonough testified that regarding each of the "c" variances, Colonia was "looking for setbacks that relate closely to that which is there now and also relate closely to what was approved on the other side of the street." In similar fashion, he explained why each of the other "c" variances requested were warranted.

The court stated at the beginning of the hearing:

> when you have a "d" variance, "c" variances . . . in most cases are subsumed into the application for the use variance. And I say that, because the example I usually give happens to deal with a . . . gasoline service station. So, for example . . . if you have a residential zone as you do here, and you want to put a gasoline service station into the residential zone it doesn't make sense to apply the residential bulk variances to a gasoline service station. More parking is required, different circulation patterns are required, buffers are required, things of that nature. And . . . I need you to address that issue.

However, PMG never addressed the issue of whether the "c" variances are subsumed in the "d" variances or whether the "c" variances were invalid. Thus, the court found, and we agree, PMG had waived its arguments. Nevertheless, the court then stated, "it is important to note that such bulk regulations are generally subsumed in the grant of a (d)(1) variance. The bulk regulations applicable to a development in the [R-40] residential zone have no relationship to the development of a commercial enterprise." The court found the issues raised by the "c" variances "are issues to be considered by the Board in considering the use proposed" and "are considered along with the site plan review to determine that, along with the prosed use, the proposed plan provides for an efficient and safe design."

The court's determination was correct. Generally, "c" variances are subsumed in an appropriate "d" variance. See Puleio v. N. Brunswick Twp. Bd. of Adjustment, 375 N.J. Super. 613, 621 (App. Div. 2005); Himeji, 214 N.J. at 301 ("As noted by the Zoning Board, the Appellate Division has observed that '[a] Zoning Board, in considering a "use" variance, must then consider the overall site design[,]' with the result that, 'the "c" variances are subsumed in the "d" variance.'" (quoting Puleio, 375 N.J. Super. at 621) (alteration in original)). Specifically, we stated in Puleio that "an application for a gasoline service

station in a residential zone should not be held to the bulk requirements of the residential zone. Lot area requirements and front and side yard setbacks for a residence were not contemplated to be made applicable to a service station." 375 N.J. Super. at 621.

McDonough's testimony established the necessity for the requested "c" variances, which the Board found to be credible. Moreover, PMG does not specifically argue the Board's grant of the "c" variances was an arbitrary and invalid decision and provides no authority to support a reversal on this ground. Accordingly, we discern no reason to reverse the Board's grant of the requested "c" variances.

III.

PMG argues that the trial court's application of the time of decision rule voids the approved (d)(1) variances and requires a remand to the Board because the B-3 zone requires a (d)(3)[5] conditional use variance for the gasoline station and drive-through Dunkin' Donuts. We reject this contention.

---

[5] N.J.S.A. 40:55D-70(d)(3) permits a board of adjustment to grant a variance for a "deviation from a specification or standard pursuant to [N.J.S.A. 40:55D-67] pertaining solely to a conditional use[.]"

"The time of decision rule required that zoning boards and reviewing courts 'apply the statute in effect at the time of the [land-use application] decision.'" Dunbar, 233 N.J. at 560 (alteration in original) (quoting Pizzo Mantin Grp. v. Twp. of Randolph, 137 N.J. 216, 235 (1994)). "The time of decision rule allowed municipalities to 'change . . . land-use ordinances after an application ha[d] been filed, even "in direct response to the application."'" Ibid. (alteration in original) (quoting Pizzo Mantin Grp., 137 N.J. at 235).

The time of application rule (TOA Rule), N.J.S.A. 40:55D-10.5, replaced the time of decision rule. Dunbar, 233 N.J. at 560. "The Legislature acknowledged that the time of decision rule had produced 'inequitable results, such as when an applicant has expended considerable amounts of money for professional services and documentation that becomes unusable after [an] ordinance has been amended.'" Ibid. (quoting A. Housing & Local Gov't Comm. Statement to A. 437 (2010)).

> In order to 'effectively prohibit[] municipalities from responding to an application for development by changing the law to frustrate that application,' the Legislature adopted the TOA Rule:
>
>> Notwithstanding any provision of law to the contrary, those development regulations which are in effect on the date of submission of an application for development shall govern the review of

A-4235-16T2

> that application for development and any decision made with regard to that application for development. Any provisions of an ordinance, except those relating to health and public safety, that are adopted subsequent to the date of submission of an application for development, shall not be applicable to that application for development.
>
> [Ibid. (alteration in original) (citation omitted) (quoting N.J.S.A. 40:55D-10.5).]

In Jai Sai Ram, LLC, 446 N.J. Super. at 345, we concluded the TOA Rule

> does not apply where the local zoning is amended to specifically permit the use which is the subject of a variance application. In that situation, the variance is no longer necessary, and it would be absurd, as well as contrary to the Legislature's purpose, to hold the applicant to the less favorable standards of the pre-existing ordinance.
>
> Likewise, where, as here, there is a pending appeal challenging the grant of the variance, the appeal becomes moot by virtue of the amendment specifically permitting the use. The dispute is moot because, even if we were to decide the appeal in appellants' favor, the applicant could proceed with the project without the variance.

The B-3 zoning was more favorable to Colonia, as "[d]rive-in, drive-through, fast-food and take-out restaurants[,]" "[r]etail stores, large format[,]" and "[a]utomotive . . . service" are permitted principal uses. Thus, the plan no longer requires a "d" variance for the convenience store and drive-through

28

Dunkin' Donuts. PMG's challenge to the Board's decision to grant the requested "d" variances is thus moot. See Jai Sai Ram, LLC, 446 N.J. Super. at 345.

In addition, a gasoline station is a permitted conditional use in the B-3 zone. A (d)(3) variance would be required for any deviation from the standards for this conditional use. However, the standard to obtain a (d)(3) variance for a deviation from the standards for a conditional use is less stringent than required for a (d)(1) variance. See Dunbar, 233 N.J. at 552. A (d)(1) variance is granted for a use that is prohibited in the zone, whereas a (d)(3) variance is granted for a conditional use that is "neither prohibited throughout the zone nor permitted at every location in the zone; rather, it is permitted at those locations in the zone where the use meets the conditions set forth in the zoning ordinance." Coventry Square, Inc. v. Westwood Zoning Bd. of Adjustment, 138 N.J. 285, 298-99 (1994) (citing N.J.S.A. 40:55D-67). Although both (d)(1) and (d)(3) variances require a showing of special reasons for approval, the bar is lower for a (d)(3) variance because the use is not prohibited. TSI E. Brunswick, LLC v. Zoning Bd. of Adjustment, 215 N.J. 26, 43 (2013). The special reasons required for a (d)(3) variance requires proof sufficient to demonstrate the site will accommodate the problems associated with the use even though the proposal

does not comply with the zone requirements for that use. Coventry Square, Inc., 138 N.J. at 298-99.

We are satisfied that the trial court correctly determined it would be a waste of time to remand this matter to the Board for review under the B-3 zone. The record amply supports the Board's grant of the more stringent (d)(1) variances, and the convenience store, Dunkin' Donuts and gasoline station are now permitted uses in the B-3 zone. As a practical matter, remanding to the Board to consider a (d)(3) variance would only result in a new application that would ultimately result in a grant of approval of Colonia's application. See Jai Sai Ram, LLC, 446 N.J. Super. at 345.

IV.

PMG reiterates that Colonia's failure to include the Authority's access road in its public notice to property owners within 200 feet of the Authority's property was a fatal jurisdictional defect warranting reversal of the Board's approval of Colonia's application.

As an initial note, the court misinterpreted PMG's claim regarding the allegedly defective notice. The court misread PMG's complaint as asserting that the Authority itself was required to receive notice of the application. The court then concluded the Authority had actual notice as evidenced by its appearance

at the public hearings. And Colonia relied on the Township's provision of a list of property owners. As such, the court's findings on this issue was error. However, this error is not grounds for reversal.

PMG argues the plan's proposed improvements to structures and conditions on the Authority's land were subject to the requirements of the MLUL and that homeowners within 200 feet were entitled to notice under N.J.S.A. 40:55D-12(b). This argument is without merit, as the Authority is not required to abide by local zoning restrictions. Town of Bloomfield v. N.J. Highway Auth., 18 N.J. 237, 249 (1955). "[T]he [GSP] legislation was intended to and does immunize fully the Authority's proper operations from the restrictive provisions of the local zoning ordinances of . . . the . . . communities along the Parkway's route." Ibid.

PMG relies on Nuckel and Angel v. Board of Adjustment, 109 N.J. Super. 194 (App. Div. 1970), to support its contention that the access road is an accessory use to Colonia's site, and thus the plan incorporated the Authority's land and brought the improvements under the auspices of N.J.S.A. 40:55D-12(b).

In Nuckel, the defendant proposed to build a hotel on a lot and provide access to the hotel by constructing a driveway which would encroach on a corner

31                                                      A-4235-16T2

of an adjacent lot, which was owned by the same principals who proposed the construction of the hotel. 208 N.J. at 97. The Supreme Court did not distinguish between the entities who owned each lot and who would be performing the construction when it held that a (d)(1) variance was required to build the driveway which would provide access to the hotel. Id. at 105-06.

In Angel, the plaintiffs purchased a lot containing a trailer park, which operated as a pre-existing, nonconforming use, and then purchased two additional lots adjacent to the trailer park. 109 N.J. Super. at 195-96. They applied for and were denied permission to build driveways permitting ingress and egress from the park on these two adjacent lots. Id. at 196. When the plaintiffs constructed the driveways, notwithstanding the denial, the building inspector found them in violation of the zoning ordinances. Ibid. We found that the driveways, since they were a means of access to the trailer park, were an expansion of the pre-existing nonconforming use and required a variance. Id. at 198-99.

Similarly, in Wolf v. Zoning Board of Adjustment, 79 N.J. Super. 546, 549 (App. Div. 1963), a restaurant sought to pave a portion of its lot, which was zoned as residential and on which a restaurant existed as a pre-existing, nonconforming use. We found the parking lot was to be "used as a means of

access to, or for the parking of vehicles of patrons of, a business, is in a use accessorial to the business and thus is itself in legal contemplation being used for the business purpose in question." Id. at 550-51. As the land being paved was previously not used for parking, a variance was required. Id. at 551.

These cases are distinguishable. First, Colonia has no ownership interest in or any control over the Authority's land. Instead, Colonia entered into a contractual agreement with the Authority under which the Authority would perform the work to make several improvements and upgrades to existing conditions on its property and Colonia would pay for it. In addition, the Authority's approval was a necessary condition of site plan approval.

Second, despite PMG making it sound like Colonia was constructing this access road from scratch, the access road was already in existence and the application only sought to make certain improvements to it. As we stated in Wolf,

> [i]f [the defendant] was using all of the land it now proposes to pave for parking cars when the zoning ordinance was adopted, its use is a valid nonconforming use and it may pave it for present use as such. Paving of an existing parking area would not constitute an illegal extension of a legal nonconforming use for that purpose[.]
>
> [79 N.J. Super. at 551.]

33

Colonia's application sought to only replace and upgrade the current fencing, buffer zones, and gate securing the access road leading to the adjacent residential area. As such, this would not necessarily be considered an expansion of a non-conforming pre-existing use, even if the MLUL was made applicable to the Authority's land under the present circumstances.

Lastly, PMG makes unsubstantiated claims that some property owners did not receive the proper notice under the MLUL. However, under N.J.S.A. 40:55D-12(c),

> the administrative officer of a municipality shall, within seven days, make and certify a list . . . of names and addresses of owners to whom the applicant is required to give notice . . . . The applicant shall be entitled to rely upon the information contained in such list, and failure to give notice to any owner . . . not on the list shall not invalidate any hearing or proceeding.

Colonia relied, as it was entitled, on the list the Township provided. If any property owner who was entitled to notice did not receive notice, this is insufficient to invalidate the granting of the application.

V.

Lastly, PMG argues the Board's resolution is insufficient and invalid because it failed to detail and support the positive and negative criteria. We have considered this argument in light of the record and applicable legal

34

principles and conclude it is without sufficient merit to warrant discussion in a written opinion.  R. 2:11-3(e)(1)(E).  However, we make the following brief comments.

> In making factual findings, the board is obligated to consider all the evidence in the case rather than merely to accept as factual every statement made by its own planning consultant.  Moreover, the board must explain how its findings support its ultimate legal conclusions.
>
> [Morris Cty. Fair Hous. Council v. Boonton Twp., 228 N.J. Super. 635, 647 (Law Div. 1988).]

There is no requirement that the Board list every single piece of evidence it reviewed and cite every single factual statement it found in its decision.  Rather, the standard of review is whether there is sufficient credible evidence in the record to support the Board's findings, and we will not disturb a Board's factual findings unless there is a clear abuse of discretion.  Medici, 107 N.J. at 23; Fallone Props., L.L.C. v. Bethlehem Twp. Planning Bd., 369 N.J. Super. 552, 560-61 (App. Div. 2004).

The Board's resolution was adequate.  It specified all of the exhibits and which portions of testimony the Board relied upon to make its factual findings and set forth the evidence and factual findings in detail.  The Board made factual findings after considering all the evidence presented and explained how its findings supported its ultimate legal conclusion.

A-4235-16T2

Affirmed.

I hereby certify that the foregoing
is a true copy of the original on
file in my office.

CLERK OF THE APPELLATE DIVISION

A-4235-16T2